We're going to begin with oral argument from Ms. Caldwell. Thank you. Thank you. May it please the court, I am Sean Caldwell and I represent Defendant Appellants Vital Home and Health Care, Inc., Management Principles, Inc. and Asif Sayeed. I want to address the anti-kickback statute when it comes to willful conduct, wrongful filing and payment in result of that filing, the resulting from language and the solicitation language. I'm also going to address the evidence and reasonable and unreasonable inferences and then I will talk about the safe harbor and the excessive fines clause. So first, regarding the willful conduct prong of the anti-kickback statute, no evidence in this case proves that the HCI company, the files that they provided to our clients, there's no evidence proving that there was willful conduct. We can talk about the case where it comes with subjective intent, when it comes to objective intent, there's no evidence showing that there was subjective or an objective intent to submit actual claims to federally funded programs. The purpose of what the arrangement was, was for the ACO feasibility study and it does apply when it comes to looking at his subjective intent when it comes to that. As far as the wrongful filing and payment of a claim for Medicare, the claim is that There were no specific patients brought forth. There were, of course, a pleading that had to happen where there had to be specificity as all fraud cases do, but once you plead it, you have to prove it. And there was no proven case of any patients that were called for services. When you look at Ukrainian Village case, at least one specific instance has to be proven and there's this misconception in this case that there was an admission of that and there was not. Regarding the resulting from language in the anti-kickback statute, there is a trend in the courts with Cairns and Hathaway, Martin versus Hathaway, where the inference that there is a taint in an anti-kickback statute that will allow damages because it was resulting from a violation. The courts have recently rejected that. But for payment, referral would not have been paid. It's the standard that they're going for. And I believe that sits very well with this case. I know the U.S. cites to Section G of the anti-kickback statute, which brings the False Claims Act into the anti-kickback statute. And in that particular situation, the False Claims Act is part of this case. So it is applicable to this case as well. And we want the courts to look at the way that that court, the Cairns court and the Hathaway court, ruled on those cases as far as was there a, but for the payment, a referral there. Ms. Caldwell, the resulting from language, that's that causation standard that gets to the question about damages, you know, the monetary award here. Is that a question best directed for you? I got a question on that. Are you or Mr. Spivak? Please. For you? Yes, for me. Okay. All right. So the principal document that was used to determine damages was this here spreadsheet, Exhibit 9. Okay. You familiar with it? Yes. Okay. And so the question I have about Exhibit 9 is, Exhibit 9 is a schedule. It's a listing by year of claims that were paid, right? It lists patient names for services that were provided by one or more of the defendant entities, right? That's what it is. Yes. Okay. So the question I have is, what does the record show? The record from the 2019 bench trial and the record from the 2021 proceedings on remand following our prior opinion, what does it show with respect to any of the claims that are listed in Exhibit 9, whether they were made pursuant to HCI's ordinary course referral, that rotational referral process that HCI, you understand the question? Yes. What's the record show? So, that particular exhibit came from our clients from Discovery, where in the first phase, they were trying to figure out the whole universe of claims. And this was discussed during the district court's case. During the trial, Mr. Saeed was asked about when they introduced Exhibit 9, is this showing your contacts with HCI? That's a very broad question. All of the evidence points to rotation. We answered it and said that this is all from rotation. Somehow, it has come up that it's no longer... What evidence did you present, though, that the claims on Exhibit 9 are the product of ordinary course rotational referrals? So, the interrogatory was, what were your contacts with HCI? What claims were you paid on from contacts with HCI? All of the evidence shows that there's rotation. When we submitted that particular exhibit, we said these are all from referrals. So, your position is that not one of these claims are the product, the fruit of data mining? Not one. So, to follow up on Judge Scudder's point, then, when the district court said, calls them ostensibly ill-gotten gains, I think that's the phrase in the opinion, is it your client's position that there is no disaggregation connecting this either to the data mining or the usual referral process, it's just all lumped in? Right. Now, the way the referral process works and the way that the quality assurance work that MPI was doing for HCI, if they saw some kind of quality issue when they were doing the HCI, it was only if it came back from rotation and was equally distributed among the providers on the list. Did you want to reserve the remainder of your time for rebuttal? Yes. Thank you. Thank you, Ms. Caldwell. Thank you. We're now going to move to Mr. Willis for the first argument on behalf of the appellee.  Thank you, Mr. Chairman. Thank you, Ms. Caldwell. Thank you. May it please the Court. Opposing counsel. I'm going to skip my introductory remarks and jump just into Justice Scudder's questions if that's all right because your honors are already thoroughly familiar with this case. I think it's an interesting point and I think you've seized on a point that teases apart several threads that the defendants here have raised, and it starts with their argument regarding burden shifting, believe it or not. They make the argument that the district court improperly shifted the burden to them to disprove damages as opposed to having the burden on me to prove damages, right? This is drawn from language in one of the district court's many findings on this case saying that the defendants had an opportunity to present evidence in support of their affirmative defense, and it's related to, as this court is thoroughly aware, the lengthy procedural history of this court in a series of step rulings. At the time the court was making that ruling and considering exactly Justice Scudder's question, what does Plaintiff's Exhibit 9 mean? What does it show and not show? They were pointing out that we were, the district court was pointing out, that we were briefing damages, and for the first time the defendants had raised this argument saying Plaintiff's Exhibit 9 actually doesn't include any datamined claims at all. It's all rotational lists, and that was being raised for the first time, and the district court was pointing out that the defendants had the opportunity of a second hearing on this case to present their case in chief, being fully aware of what this court had said on its first appeal. They had the opportunity to present any evidence that they wished, showing that these were in fact rotational referrals. Now remember, HCI was a defendant in this case and answered discovery. I have all of HCI's records regarding those patients, as do defendants. I've been through them in the thousands of pages. They're not in the record because not one of them was relevant to show that there was a rotational referral. Not one. Had I known, had I looked through those and seen rotational referrals, it would have been improper for me to ask for damages on those. The rotational referrals came about through the ordinary courts. So to answer Justice Scudder's question is, what is the evidence in the record saying that Plaintiff's Exhibit 9 is rotational referrals? And the evidence is testimony by Mr. Saeed that the district court explicitly found not credible, contradicted by his prior testimony in 2019, and contradicted by the testimony of other witnesses. Okay. Can I ask you a question, Mr. Willis? Absolutely. So what you've done, it's helpful, but you've kind of put it in the negative. Okay. What you've said, the defendant hasn't done this. Okay. But the plaintiff in the first instance bears the burden, right? Absolutely. Of satisfying the resulting from statutory causation standard and then showing ensuing damages. So let me ask you, in the affirmative, what does the evidence show that the claims in I'm just going to use shorthand, data-mined claims. That is absolutely the question that the court should be focused on, because this is my burden of proof as to damages. And what the evidence shows is that Plaintiff's Exhibit 9, as Ms. Caldwell conceded, was an exhibit created by defendants in response to discovery, asking them, what is the universe of potential claims at issue in this case during Phase 1 discovery? The universe out of all of the defendant's clients. What is the universe of those clients that came about through your contacts with HCI? That's Plaintiff's Exhibit 9. The next step is the discovery from HCI where they provide their reports to show, are any of these rotational referrals, which defendants had. The next step is the trial testimony of Ella Gray's and Asa Saeed in 2019, showing what are these patients, what was HCI's conduct vis-a-vis these defendants. And specifically, what Ms. Gray said, and I think that this gets obscured with the focus  What Ms. Gray said, and all the evidence confirms, HCI made very few healthcare referrals through this program. What they were doing was screening people for completely separate non-healthcare programs through the Illinois Department of Aging. Meals on Wheels, Home Heating Assistance, Home Cleaning, all these other programs. And what Ms. Gray testified and what other witnesses confirmed as well, most of our clients already had their own doctors. These are seniors. They are aware of the Medicare program. They're already taking advantage of it. We had very few referrals for home healthcare, right? Because most people, if they needed those services, they were already receiving them. And when we did those referrals, they went on a rotational list. And HCI's expectation was there will be very few that we would see that would have gone to these defendants just because we don't do very many and there's lots on that list. Can I restate something and you tell me if I'm right or if I'm wrong? Yes. What you're saying, I think, is that if you look at the context in the litigation and the surrounding representations pursuant to which Exhibit 9 was produced by the defendants, the conclusion is clear or it's clear enough to support the district court's finding that this is a schedule of data-mined claims. Is that what you're saying? Every word of that is true. Would you like to give the rest of your time then to Mr. Winnick? Yes, Your Honor. Absolutely. Very good. Thank you very much, Mr. Willis. Mr. Winnick, we'll move to you now for the remainder of Apley's argument. Good morning, Your Honor. May it please the Court, Daniel Winnick for the United States. I'd like to start with the question of what connection is required between a violation of the AKS and a subsequent Medicare or Medicaid claim for the AKS to render the claim false. The correct answer to that question is that if remuneration is given to induce referrals or the provision of items or services and those intended results of the remuneration come to pass, a claim for them is false and that's true under either of two theories of falsity. The first is the implied certification theory of falsity that long predated the 2010 Amendment to the statute and that this Court applied, for example, in Rogin. And the second is under the 2010 Amendment that Congress added to the AKS to make it easier to prove FCA claims based on AKS violations. Now, as some of the Court's questions have noted, the circuits are split as to whether a claim is false under the 2010 Amendment only if the items or services in question would not have been provided but for an AKS violation. But the Court needn't wade into that circuit split to resolve this case and that's true for two reasons. The first is that the claims would be false here under an implied certification theory even aside from the 2010 Amendment. So in Rogin, where the defendants conspired to pay doctors to refer patients to a hospital, the Court didn't ask whether the patients might have come to the hospital even aside from the kickback. The Court recognized that those claims were false because they misrepresented compliance with a material condition of payment under Medicare and Medicaid, namely compliance with the AKS and the Stark Act. And the second reason is that even if the 2010 Amendment were the only means of proving falsity here, and even if a but-for standard of causation did apply under that provision, it's very clear, I don't take defendants to dispute, that MPI wouldn't have obtained the data that it used to solicit patients for services had it not paid HCI. Now if the Court thinks that there's an open question about the claims on Exhibit 9, if it thinks that there's a question as to whether some of them came from the rotation and some of them came from data mining, I think there too the analytic pathway would be different under the 2010 Amendment depending on what standard of causation were chosen. But again, that's not the only means of proving falsity here. The judgment can be sustained solely on an implied certification theory. And second, even if it were the only means of proving falsity, I think the analysis gets to the same place because of what I take to be relators' view that the remuneration here wasn't given to induce additional referrals from the rotation. So if you apply what we think is the correct nexus standard, the analysis goes, as to claims for patients in the rotation, the analysis would be, are those the kinds of claims, the kinds of referrals that the remuneration was given to induce? If so, then claims for them are false. If not, they're not false. And I take relators' view to be that the remuneration was not given to induce additional referrals from the rotation. Under the but-for standard, you'd get to the same place. You'd say, would those referrals have been any different if not for the kickback? And the answer is no, they'd be the same. Again, I've spent most of my time here urging the Court not to reach the question on which the circuits have divided. I don't think you need to. If the Court were going to get there, let me spend just a little bit of my remaining time explaining why I think the Sixth and the Eighth Circuits have gotten to the wrong reading of the 2010 amendment. So what the Supreme Court has taught in the cases on which those courts relied is that language like resulting from implies a standard of factual causation. But it doesn't mean that the standard is but-for causation. That's only a default standard. And as the Supreme Court said both in Burrage and in Paroline, there are other standards and courts have to look to whether there is textual or contextual evidence that a different standard is more appropriate in a given case. I presume those arguments were offered in the Hathaway and the Eighth Circuit cases and rejected? They were, Your Honor. We think the courts simply didn't give sufficient consideration to the textual and contextual evidence that a different standard is appropriate here. The reason it's appropriate here is that what Congress chose to forbid in the AKS is kickbacks themselves. Congress recognized that the provision of financially conflicted care is a huge problem and it's often difficult to know whether a financial conflict actually changed a subsequent medical decision. Medical decisions are complicated and they're made for all sorts of reasons. And so what Congress forbade is the conflict itself and that's why federal health care programs categorically refuse to pay for financially conflicted care. That's why it was true long before the 2010 amendment that a claim that misrepresented compliance with the anti-kickback statute was false for FCA purposes. And there's no reason to think that in enacting the 2010 amendment, Congress meant to require proof of the sort of evidence that had always previously been irrelevant, namely that a kickback actually changed a subsequent medical decision. And that's certainly not required by the resulting from language. To the contrary, I think there's strong evidence in the statute itself that courts should look to the nexus that Congress in the AKS specified as problematic between a kickback and subsequent medical care, which is, if I might just finish my answer. If the kickback is given to induce a referral or the provision of an item or service, that's the problem Congress identified. And so we think it's perfectly sensible to say that if remuneration is given to induce those outcomes and they then result, then for the purpose of this provision, those are deemed to be resulting from the kickback and the claim from them is false within the meaning of the FCA. That's what the Third Circuit held in Greenway versus Medco. That's what nearly every district court to consider. The question both before and after the Sixth and Eighth Circuit's decisions has held. And again, we don't think the court needs to get into these issues to resolve this case. But if the court does reach them, we think it should reject the Sixth and Eighth Circuit's reasons for the statute. Thank you, Mr. Winnick. Thank you. Ms. Caldwell, we'll go to you. We understand you'll have two minutes and Mr. Spivak will have three minutes. Yes. As Relator pointed out, there was some finding about our client's 2021 testimony. We're not even using the 2021 testimony. We're using the 2019 testimony where Mr. Syed said he did not solicit for his own home health companies on page 103. So, that along with the testimony from multiple witnesses, Ella Gray's HCI's manager stated that we were calling to offer services, see if services started, see if they needed a doctor. It was all part of the MSA. It was a quality-based program. It was a quality initiative. So, even if there was a finding of violation of the anti-kickback statute, the safe harbor still applies. When you look at the four corners of the MSA, not all the testimony to pointing to Exhibit 1, 2, and 3, which was about PowerPoints that were not implemented, and a lot of the confusion came from that. There were PowerPoint presentations in November and before where there was some other alternatives that they were considering doing. They did not implement it. Four Corners of the MSA says that there's quality-based initiatives going on. There's assessments that HCI does that helps with the chart review, which is the ACO feasibility study. All of the evidence points to there were patterns being looked at to determine whether there were quality issues with anything that was going on. If anything went back to anyone, it went back to HCI first, and they put it through the rotation. Thank you, Ms. Caldwell. We'll now move over to Mr. Spivak for the final rebuttal argument on behalf of the appellant. We'll give you three minutes. Thank you. Thank you, Judge. Just to answer those questions, going back a little bit, the way this case started, you And it survived motions to dismiss when they finally came up with a Third Amendment complaint that named some specific supposed people that got gift cards in exchange for some sort of referrals. The first one they named was someone named Rosetta Sims, then a Bernice Parker, then a Jesse Newell, and that supposedly gift cards were exchanged in order to get these particular clients. When the time came for the trial, none of these people testified. None of these people supported that particular contention. They said that apparently the person that was supposedly distributing these gift cards was Alice Piewarski, and that she was doing it in terms of, I think they said, target gift cards starting at about $50, I think it was like $50 gift cards up to $150 or $250 gift cards. That turned out to be completely bogus. Alice testified. She even questioned who says that. It wasn't even true. So it was completely false what they started with in order to get this case going. It then morphed into the contract, and that brings me to like Exhibit 9. Exhibit 9, that was an interrogatory request, and it requested the defendants to identify all individuals for whom they submitted a claim for reimbursement of any type from Medicare or Medicaid for services performed from November 2008, which, of course, is like two years before there was any management services agreement, up to the present. That's what Exhibit 9 was. It did not particularly say anything about, it didn't eliminate maybe gift card ones, like they alleged in the very beginning. It did not eliminate... So you're saying Exhibit 9 is a schedule of 100% of claims? Of 100% of claims. So all the claims that they got from HCI, of which most of them are on the rotational system. That's what they were there for. There's no indication of telling us a specific... Unlike the way they did it in the complaint with Bernice Parker and these other people, there's no specific claim that is related to someone that came from this supposed data mining. And that was their burden to do. So there was no evidence at all, and for that reason, they didn't show any damages or any violation, and we believe that the court should reverse. Thank you, Mr. Spivak. Thank you, Judge. Thank you, Ms. Caldwell. Thank you, Mr. Willis, and thank you, Mr. Winnick. The case will be taken under revision. Thank you. We're not... Yeah, I guess it's not clear. We're now going to move to Appeal 21.